# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MAURICEA DIXON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 1843 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| CAROLYN W. COLVIN[1], Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Mauricea Dixon, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Childhood Disability Benefits ("CDB") under 42 U.S.C. § 402(d)(1). Ms. Dixon asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Ms. Dixon applied for CDB on September 12, 2008, alleging that she had become disabled on January 1, 1999. (Administrative Record ("R.") 167-68). Her application was denied initially and upon reconsideration. Ms. Dixon continued pursuit of her claim by filing a timely request for a hearing.

An administrative law judge ("ALJ") convened a hearing on May 4, 2010, at which Ms. Dixon, represented by counsel, appeared and testified along with her adoptive mother. (R. 25-88).

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

In addition, Lee Knutson testified as a vocational expert. (R. 25). On November 2, 2010, the ALJ issued a decision finding that Ms. Dixon was not disabled because she retained the capacity to perform simple work involving one- or two-step tasks, little or no decision-making, and few if any changes in the workplace. (R. 15). This became the final decision of the Commissioner when the Appeals Council denied Ms. Dixon's request for review of the decision on January 13, 2012. (R. 1-4). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. King has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE

### A.
### Vocational Evidence

Ms. Dixon was born on November 4, 1988, making her twenty-one years old at the time of the ALJ's decision. (R. 29). She was not working at the time. (R. 29). She couldn't recall the last time she had worked – perhaps a daycare job in 2007. (R. 30). She had completed two years of college before she was kicked out for fighting (R. 29) – or perhaps for simply not showing up (R. 619) – she gives two versions of this story. She also spent time in jail for shoplifting. (R. 30).

### B.
### The Medical Evidence

The medical record in this case is the tale of two treating sources. On the one hand, there is a psychiatrist, Dr. Carter, who saw Ms. Dixon on a monthly basis. He prescribed her medication and reported on her progress. Almost invariably, she told him her prescription regimen was working and she was doing well. The doctor's examination results were generally positive. (R. 359-86, 469-74, 532-38). For example, in May 2008, Ms. Dixon said her medication"was going fine." She was

able to focus and stay on task and was making an effort in school. Dr. Carter's examination was essentially normal. He noted that she was having a good response to her medication, and was able to focus and make and effort in school – if she wanted. Dr. Carter assigned her a Global Assessment of Functioning ("GAF") score of 70, denoting some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. www.gafscore.com. (R. 363).

It was much the same the next month, with a little improvement. The July 2008 examination indicated that Ms. Dixon exhibited good focus, concentration, and organization. She said her mood was okay. On examination, her affect was normal, her insight good, her judgment fair, and her impulsivity low. Dr. Carter assigned her a Global Assessment of Functioning ("GAF") score of 74 (R. 362), indicating whatever symptoms she had were transient and expectable reactions to psychological stressors, and that she had no more than a slight impairment in social, occupational, or school functioning. www.gafscore.com. By February of 2009, she was stable and there were no new concerns. She was warned against use of drugs or alcohol with her medication. (R. 534). Her GAF score was 80, again indicating only transient symptoms. In May of that year, she said she was doing fairly good and was making more friends. She hadn't been using marijuana and her alcohol use was "minor." Her GAF score was, again, 80. (R. 532).

There were setbacks, of course. In March 2009, Ms. Dixon reported that she had stolen a pair of sunglasses and spent three weeks in jail. (R. 533). In June 2009, Ms. Dixon had been mixing her medications with marijuana use. She had good focus and concentration until the afternoon, when she would fail to take her afternoon dose of medication (R. 535). Her GAF score that month was just 64 (R. 535), which still meant only mild symptoms or difficulties in school, but that she was

functioning pretty well.  www.gafscore.com.

Over the course of two to three years, Dr. Carter's reports indicate that Ms. Dixon's GAF score generally ranged from the 70s to the 80s, with scores in the 80s meaning  her symptoms were absent.  These reports, in the main, revealed that when Ms. Dixon complied with her medication regimen, she did well.  The problems appeared to be that she would sometimes forget to take it in the afternoon (*see, e.g.*, R. 365, 366, 368, 372), and as a result, become more distracted in the afternoon.  (R. 538).  She also would mix it with drugs or alcohol, despite being warned against it. (R. 375, 377, 471, 535).

On the other side of the ledger are a series of quarterly reports from either Dr. Massette – a psychologist – or Ms. Saunders – a therapist.  Dr. Massette has reported that one or both of them saw Ms. Dixon on a weekly basis, and began their therapy a few years before Dr. Carter.  (R. 447).  But, their reports cover the years 2006 through 2010.[2]  (R. 565-642).  Their reports are also far more dire than those of Dr. Carter.  In the main, these mental health professionals assigned Ms. Dixon GAF scores in the 40s, indicating "[s]ome impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  www.gafscore.com.  As a whole, they depict a college-aged woman with ADHD, focused on her boyfriend to the detriment of her studies and work, mixing her mediation with alcohol, and rebelling against her adoptive parents.

For example, in a June 2007 report, Dr. Massette had a laundry list of diagnoses for Ms.

---

[2] There is a single report from 2003.  (R. 638).

Dixon, including: adjustment disorder with anxiety and depressed mood, attention deficit hyperactivity disorder, oppositional defiant disorder, fetal alcohol syndrome, history of abuse and neglect. She was defiant and resistant to authority. She assigned Ms. Dixon a GAF score of just 45. (R. 630-32).

A December 15, 2008 report from therapist Doris Saunders states that Ms. Dixon's GAF score that quarter had ranged from 55 to 68.[3] (R. 621). Ms. Dixon was taking just a single college course and this was noted to be "commensurate with her intellectual ability." (R. 623). She lost her job because she had a habit of not showing up on time. (R. 623). She was looking for a new job. (R. 623). Ms. Dixon was involved in an on-again, off-again romantic relationship that contributed to her depression, but she could not see this. (R. 623). She focused on this relationship rather than on her future and career – her decision-making skills were poor. (R. 623, 624). She had recently had a seizure and it may have been due to mixing alcohol with her medications – her mother indicated she sometimes came home intoxicated after seeing her boyfriend. (R. 623-25). But, she was becoming more open to suggestions for improvement and her appearance was always excellent. (R. 623).

A March 2009 report from Dr. Massette and Ms. Saunders (R. 602) noted that Ms. Dixon "often displays a disrespectful attitude when confronted with anything that will assist her in improving her quality of life." (R. 601). Yet, at the same time, it stated that Ms. Dixon "continued to be responsive in therapy and offers feedback well." (R. 601). Her reduced class load allowed her to "make progress and return to completely simple educational tasks and staying focused." (R. 601).

---

[3] While a score of 68 would reflect mild symptoms, a score of 55 would reflect moderate symptoms or difficulties in social, occupational, or school functioning. www.gafscore.com.

Still, organization was a challenge for her. (R. 601). The report indicated that Ms. Dixon had the skills to allow her to focus, but she viewed it as a waste of time. (R. 601). She looked for ways to sabotage herself. (R. 601). The report noted that she had issues with adults and authority figures, but she was no longer on a destructive path with her relationships. (R. 601). At the same time, it said unsuspecting family members or strangers were often the recipients of her explosive anger. (R. 601).

An unsigned report, dated May 2009, indicates that Ms. Dixon's speech was coherent, her thought process was circumstantial, and she had obsessions but no delusions. She was fully oriented and had no problems with immediate, recent or past memory, or information. She could perform basic mathematical calculations. (R. 551, 553). But the report also stated that she could not stay focused and refused to accept deviation. (R. 552). She needed reminding to follow and remember simple instructions and needed step-by-step supervision to complete tasks. (R. 552).

On September 30, 2009, Ms. Saunders stated that Ms. Dixon's GAF score that quarter ranged from 40 to 48. (R. 616, 620). At that time, Ms. Dixon was concentrating on her boyfriend to the exclusion of her schooling, career, and goals. (R. 619). She had been fighting over him with her cousin – who was also in a sexual relationship with him – and drinking excessively. (R. 619). Ms. Saunders noted that Ms. Dixon's boyfriend's only interest was her Social Security disability check. (R. 620). Ms. Dixon was irresponsible and unaccountable for her own actions. (R. 619). She was mixing street drugs with her prescribed medications. (R. 619). She did this while staying at her cousin's house over the weekends; she promised to terminate these visits. (R. 619). The possibility of attending AA was discussed. (R. 619). Ms. Dixon had recently been dismissed from college for lack of attendance. (R. 619).

A December 2009 report is signed by both Ms. Saunders and Dr. Massette. (R. 593). Ms. Dixon was still mixing street drugs with her prescribed medications, and engaging in "inappropriate sexual behavior." (R. 592). The report stated that she spent Thanksgiving with her boyfriend and his family but "returned home with a swollen right eye, empty pockets, and totally broken self-esteem." (R. 592). She refused to press charges. (R. 592). Ms. Dixon would no longer listen to her adoptive parents because she was going to move in with a former foster mother. (R. 592).

While the divergence of opinion between Dr. Carter and Dr. Massette/Ms. Saunders is the focus of the parties in this case – with Ms. Dixon favoring the Massette-Saunders line, and the Commissioner preferring Dr. Carter's take on things – there is some additional evidence in the record. For one, there is Ms. Dixon's college transcript. In her first semester of college, ending December 2007, Ms. Dixon didn't fair too poorly. She earned Bs in computer literacy and writing workshop, a C in general math, and a passing grade in foundations of college science. She failed her business course, however. After that, she either failed or withdrew from her next eleven classes through May of 2009. (R. 328).

There is a report from a psychologist, Dr. Long, who performed a consultative exam in connection with Ms. Dixon's application for benefits in November 2008. It quotes from a report of a telephone interview Ms. Dixon had with the Bureau of Disability October 30, 2008, in which she alleged she was " pre-natally exposed to alcohol." (R. 439). Dr. Long, said that Ms. Dixon had a flat affect and spoke in a monotone. (R. 439). She seemed quite depressed, but denied depression. (R. 439). Ms. Dixon listed her main problems as short attention span and panic attacks, which could lead to her blacking out. She claimed she had been fired from a job at a gas station due to a seizure. She was in college and went to only one class due to her limited focus. She failed all her courses

the previous semester. She had friends, and at home she cleaned, slept, and ate. (R. 440). After interviewing Ms. Dixon, Dr. Long felt she had a generalized anxiety disorder. (R. 441).

The record also includes the reviews of state agency physicians, most notably the psychological review from Dr. Terry Travis in January 2009. Dr. Travis noted diagnoses of an attention deficit disorder, a learning disability, and a generalized anxiety disorder. (R. 450, 454). He felt Ms. Dixon had only mild limitations in her ability to perform daily activities and function socially, and a moderate limitation in her ability to maintain concentration, persistence, or pace. (R. 459). While she was moderately limited in her ability to understand and carry out detailed instructions and maintain attention for extended periods, she had no trouble with simple instructions, sustaining an ordinary routine without supervision. (R. 463). There was a moderate limitation in her ability to complete a normal workday and week without interruptions, get along with co-workers without distracting them, and setting realistic goals and setting plans independent of others. (R. 464). Considering these limitations, Dr. Travis opined that could perform a job that involved one- or two-step tasks that she could learn in a month. She could function reasonably well, adapt to circumstances, relate appropriately, and learn simple instructions. (R. 465).

## C.
### The Administrative Hearing Testimony

#### 1.
##### The Plaintiff's Testimony

At her hearing, Ms. Dixon said she had completed two years of college before she was kicked out for fighting. (R. 29). In reality, she had only completed one semester and a couple of classes (R. 328), and she was kicked out for lack of attendance. (R. 619). She also claimed that she was in special education all through high school, yet she finished 208th out of 404 students and was

accepted into South Suburban College. (R. 29-30). She claimed her last job was in 2007, but her earnings report showed she made $14,000 in 2009. (R. 30-31). She said she didn't file a tax return because she hadn't worked long enough. (R. 31). She alleged she had only worked three weeks. (R. 31). So, had she worked a full year, she would have earned about a quarter of a million dollars. She later tried to explain this by saying someone stole her Social Security card. (R. 33).

Ms. Dixon said that she spent her days sleeping, eating, watching TV, and going on the internet. (R. 36). She chatted with friends on Facebook three or four times a week. (R. 37). She claimed she sometimes forgot her password (R. 37), but later allowed that she had only done so twice. (R. 39). Even so, she was able to recount to the ALJ at length the process she would go through to get a new one. (R. 37-39). Ms. Dixon also stated that she would go out with friends to the mall or to eat. (R. 40). She stayed over at a friend's apartment two or three times a week. (R. 41). She also admitted that she ignored her doctors' orders and mixed alcohol with her medications. (R. 45). The last time she had a seizure, it was due to alcohol use – her blood alcohol was over twice the legal limit at .183. (R. 46). She claimed she had last used marijuana in January of 2009, and had only used it a few months. (R. 47).

### 2.
### The Plaintiff's Mother's Testimony

Ms. Dixon's adoptive mother testified that the plaintiffs had seizures in her sleep and "staring" seizures. (R. 62-63). When she took her medication most of the time it helped. (R. 62). Ms. Dixon hadn't done well in college because "[s]he didn't go to class like she was supposed to." (R. 64). The only problem Ms. Dixon exhibited at home was that she didn't follow the rules. (R. 69). Rather than do her chores, she would sleep or watch TV. (R. 70). She got kicked out of school because "she didn't meet the criteria in the financial aid going back and forth to class." (R. 76).

## 2.
## The Vocational Expert's Testimony

Finally, Ms. Knutson testified as a vocational expert. She testified that a person who had no exertional limitations, but could not work at heights or around dangerous machinery or drive, and could only perform one- or two-step tasks, and manage jobs with little or no decision-making or changes in the work setting, could perform many jobs in the regional economy. (R. 81). At the medium exertional level, these included 26,000 simple assembly jobs, 1600-1700 inspector/checker jobs, and 12,000 packer jobs. (R. 81). At the light exertional level, there were 19,000 assembler jobs, 17,000 hand packer jobs, and 6700 inspector/checker jobs. (R. 81). The VE testified that her information was consistent with the Dictionary of Occupational Titles. (R. 82).

Ms. Knutson explained that assembly jobs would be simple, like screwing one part into another and putting it aside. (R. 83). If one were only considering the most basic of assembly or packing jobs, that would reduce the number of available jobs by 30%. (R. 83). Ms. Dixon's attorney asked whether a person could have a personal job coach on such jobs, and the predicable answer was no. (R. 83). They also could not be off task more than 15% of the time or miss more than four days of work per month. (R. 84).

## D.
## The ALJ's Decision

The ALJ found that Ms. Dixon suffered from the following severe impairments: learning disability, attention deficit hyperactivity disorder (ADHD), generalized anxiety disorder, depression, and seizure disorder. (R. 13). The ALJ next determined that she did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 20). He specifically found that her seizure disorder did meet listing 11.02 for epilepsy, and her mental impairments did not

meet listing 12.02 – covering organic mental disorders – or 12.06 – covering anxiety-related disorders. (R. 13). She had only mild limitations in her daily activities and social functioning, and moderate limitations in concentration, persistence, and pace. (R. 14). She has had no episodes of decompensation. (R. 14).

The ALJ went on to determine that Ms. Dixon had the residual functional capacity to perform light work, except that she could not work around heights or dangerous machinery; she could not drive; and she was limited to simple work requiring only one- or two-step tasks, little or no decision-making, and involving few, if any, changes in the workplace. (R. 15). The ALJ then summarized Ms. Dixon's testimony, as well as her mother's. (R. 16). He determined that Ms. Dixon's allegations were not fully credible. He based this on the objective medical evidence, inconsistent statements from Ms. Dixon and her mother, both at the hearing and to treating sources, and reports indicating that Ms. Dixon did well when taking her medication properly. (R. 17-18). The ALJ gave no weight to the dire reports of Dr. Massette, as they were inconsistent with treatment notes and other medical evidence, especially the assessments of Ms. Dixon's treating psychiatrist. (R. 19, 21). The same was true of the opinions of Ms. Saunders. (R. 21). The ALJ added that neither Ms. Saunders nor Dr. Massette were acceptable medical sources (R. 21). The ALJ explained the weight he accorded the opinions of the various state agency consultants, essentially adopting the restrictions laid out by the psychologist, and giving some weight to the physician's assessment. (R. 20).

Finally, the ALJ summarized the vocational expert's testimony that a person with Ms. Dixon's limitations could still perform a number of jobs – like assembler and packager – that existed in significant numbers in the regional economy. (R. 23). The ALJ accepted this testimony, and

relied upon it to find Ms. Dixon not disabled and not entitled to SSI under the Act. (R. 23).

# IV.
# DISCUSSION

## A.
## The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow

the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009).

In Social Security cases it has become *de rigeur* to invoke the now familiar "logical bridge" requirement of *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996) as a basis for reversing an ALJ's decision that is adverse to the claimant. But as occurs so often where catch phrases are involved, the phrase, "logical bridge" has taken on a life of its own as though it were some self-defining and exacting test, which requires that an ALJ's decision be viewed grudgingly. But, as Justice Holmes warned, courts must be wary of the uncritical and indiscriminate use of labels and catch phrases: "It is not the first use but the tiresome repetition of inadequate catch words upon which I am observing—phrases which originally were contributions, but which, by their very felicity, delay further analysis...." Holmes, *Law and Science and Science and Law,* 12 Harv. L. Rev. 443, 455 (1899). *See also Lorenzo v. Wirth,* 170 Mass. 596, 600, 49 N.E. 1010 (1898) (Holmes, J.)("Too broadly generalized conceptions are a constant source of fallacy").

Indeed, Judge Posner, who coined the phrase in *Sarchet,* would be the first to acknowledge that it was not meant as a self-defining test or rigid formula. *Compare, e.g., United States v. Edwards,* 581 F.3d 604, 608 (7th Cir.2009)( "We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 990 (7th Cir.2004). The point Judge Posner sought to make in *Sarchet* was that unexplained conclusions by Administrative Law Judges are not persuasive and preclude meaningful appellate review. An opinion – any opinion – only has strength proportioned to the sources that sustain it.  Unsupported conclusions or assertions have no value. *Compare Miller UK Ltd. v. Caterpillar, Inc.,* 2014 WL 67340, 6 (N.D.Ill.2014)(collecting cases).

But there is nothing particularly novel about that conclusion, as *Sarchet,* itself, recognized

with its reliance on *Herron v. Shalala,* 19 F.3d 329 (7th Cir.1994). There, the court said: "Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence. Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion. We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some minimal level his analysis of the evidence.' " *Id.* at 333–334 (citations omitted).

Thus, *Sarchet* never intended that the "logical bridge" requirement compel or warrant a hypercritical approach to an ALJ's decision. The "logical bridge" requirement is not about *elegantia juris or* aesthetics. The ALJ need not build the Pont Neuf. A simple covered bridge will suffice so long as it allows the reviewing judge to traverse safely the divide between the evidence and the conclusions. The ALJ's explanations in this case do that.

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

### 1.

Ms. Dixon challenges the ALJ's treatment of the opinions of Dr. Massette and Ms. Saunders. She argues that the ALJ erred when he said that she was not an acceptable medical sources. (R. 21). The Commissioner concedes that the ALJ erred here since Dr. Massette, as a psychologist, qualifies as an acceptable medical source. 20 CFR §404.1513(a); (*Defendant's Response*, at 5). Ms. Saunders, as a therapist, is not an acceptable *medical* source, but is nonetheless an acceptable source, and her opinion could not dismissed so readily either. 20 CFR §404.1513(d)(1); SSR 06-3p; (*Defendant's Response*, at 5). But the Commissioner submits that the other reason the ALJ gave were sufficient to uphold his rejection of the two opinions as supported by substantial evidence.

The ALJ concluded that the opinions from Dr. Massette and Ms. Saunders were drastically different from that of Ms. Dixon's treating psychiatrist, Dr. Carter, and the treatment notes from the Aunt Martha Clinic. The records from Dr. Carter and the clinic paint a much more positive portrait

than do the reports from Dr. Massette/Ms. Saunders. Ms. Dixon's GAF scores ranged from the 60s – indicating mild symptoms – to 80 – suggesting no more than transient symptoms that were expectable reactions to psychological stressors. www.gafscore.com. During the same period, Dr. Massette and Ms. Saunders were assigning Ms. Dixon GAF scores in the 40s, meaning they thought she was exhibiting serious symptoms or suffering from a serious impairment in functioning. www.gafscore.com. The two sets of notes are as different as night and day.

Where, as here, there is such conflicting evidence in the record, it is up to the ALJ to decide which to accept, and his choice will be upheld as long as it is supported with substantial evidence. A reviewing court "is not allowed to substitute its judgment for the ALJ's by . . . reweighing evidence [or] resolving conflicts in evidence . . . ." *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). *See also Dixon v. Massanari,* 270 F.3d 1171, 1178 (7th Cir.2001) (ALJ may decide whom to believe between medical sources, "so long as substantial evidence supports that decision.").

Here, the ALJ recognized that Dr. Carter was a psychiatrist while Ms. Saunders was a therapist and Dr. Massette was a psychologist. That is a significant and legitimate factor that an ALJ may utilize in his analysis. *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir. 2011). Moreover, he was the plaintiff's treating physician, while the others were not. A treating physician's opinion receives controlling weight if it is well-supported" and "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *see Scott,* 647 F.3d at 739; *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir.2011); *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir.2010). An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *Martinez v. Astrue,* 630 F.3d 693, 698 (7th Cir.2011). The ALJ here had more than ample justification to prefer Dr. Carter's testimony.

Ms. Dixon argues that the ALJ bet on the wrong pony, and offers some reasons why. One

of them, which we address first, is disconcerting – but not because it reflects adversely on the ALJ. She claims that "Dr. Carter's treatment notes illustrated an alarming lack of awareness of Plaintiff's level of functioning . . . from Feb. 2008, Dr. Carter wrote that Plaintiff's 'grades were excellent' and that her 'medication was working good.'" (*Plaintiff's Memorandum*, at 14). Ms. Dixon confesses that her grades were not excellent, that they were extremely poor, and argues that this undermines Dr. Carter's credibility. The problem is that, in the report Ms. Dixon is referring to, Dr. Carter was quoting her. And that undermines her credibility, not his competency! The note does not evince a lack of familiarity with Ms. Dixon's condition, but rather Ms. Dixon's being willing to lie to the doctor about her success in school.

The note appears in the section titled "CC", which, as plaintiff's counsel knows from the 100s if not 1000s of Social Security medical records he has poured over, means "Chief Complaints." It is the section of the report where the doctor records the patient's statements:

Pt – "It's working good"

Pt – [not] using 4 pm MPH - forgets

Pt – [doesn't] feel she needs 4 PM dose. Grades excellent -

Pt reports [she's not] pregnant; counselled not to get pregnant or drink.

(R. 365). So, the note doesn't undermine Dr. Carter's credibility at all; it undermines Ms. Dixon's. Worse, it means that Ms. Dixon's counsel has mischaracterized the record, and that is indefensible.

That's not the only mischaracterization in Ms. Dixon's brief. Ms. Dixon takes Dr. Carter to task for being unaware that her boyfriend was physically abusive. (*Plaintiff' Memorandum*, at 15). She asks us to compare Dr. Carter's note at page 471 of the record with a report for Dr.

Massette and Ms. Saunders at page 592. The report from Dr. Massette and Ms. Saunders is dated December 30, 2009. (R. 593). It relates that Ms. Dixon spent Thanksgiving with her boyfriend and his family and received a swollen right eye –presumably from her boyfriend, although it does not say. (R. 592). The note from Dr. Carter certainly does not relate such an incident – nor could it *as it is dated January 6, 2009, ten months before the incident*. What the note does tell us is that Ms. Dixon said she was doing okay, had good focus, concentration and memory. However, she was mixing her medications with marijuana use, which Dr. Carter had warned her not to do.

In isolation, these mischaracterizations would be troubling enough, but it is not the first time this has occurred in cases in which Ms. Dixon's counsel has been involved. *See King v. Colvin*, 2013 WL 3944182, *10 n.2 (N.D.Ill. 2013); *Orienti v. Astrue*, 2013 WL 4008719, *16 (N.D.Ill. 2013); *Khan v. Colvin*, 2013 WL 5700961, *8-9 & n.5 (N.D.Ill. 2013); *Triplett v. Colvin*, 2013 WL 6169562, *1 n.2, *9 (N.D.Ill. 2013). In each cases, the mischaracterization of the record has worked in the plaintiff's favor, making it difficult to write them off to carelessness.

Aside from arguments based on a distortion of the record, which is a violation of Rule 11, Federal Rules of Civil Procedure, the tactic of arguing anything that comes to mind does not advance – and ultimately disserves – the interests of the party on whose behalf the lawyer thinks he is helping. *Cf. Walker v. Abbott Laboratories*, 416 F.3d 641, 643 (7th Cir.2005); *Rehman v. Gonzales*, 441 F.3d 506, 508-09 (7th Cir.2006); *United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001); *Rice v. Nova Biomedical Corp.,* 38 F.3d 908, 918 (7th Cir. 1994); *United States. v. Brocksmith,* 991 F.2d 1363, 1366 (7th Cir.1993); Matthew Kennelly, *Over-Arguing Your Case*, 40 LITIGATION 41 (Winter 2014).

Beyond that, Ms. Dixon notes that the ALJ points to Dr. Carter's report that Ms. Dixon's

ADHD was well controlled with medication. (*Plaintiff's Memorandum*, at 13). She submits that, even if that were the case, ADHD is just one of her impairments – she also suffers from other psychological disorders. And, indeed, while the ALJ did not credit all of the diagnoses Dr. Massette provided, he did specifically find Ms. Dixon suffered from anxiety disorder and depression. (R. 13). But this is the only arguably worthwhile point Ms. Dixon raises, and it is far outweighed and overshadowed by her mischaraterizations of the evidence and faulty points.

For example, Ms. Dixon also submits that the ALJ ignored relevant evidence that supported Dr. Massette's opinion, citing notes from 2003, 2006, and 2010. (*Plaintiff's Memorandum*, at 13). But these records are reports from Dr. Massette, and the ALJ considered and rejected these assessments of Ms. Dixon as inconsistent with the balance of the record. Ms. Dixon's argument might make a little more sense if the ALJ discredited Dr. Massette's opinion as inconsistent with *her own* treatment notes. But he didn't. Dr. Massette didn't submit any treatment notes.

Ms. Dixon claims Dr. Carter saw her only once every two or three months, compared with weekly visits with Dr. Massette. (*Plaintiff's Memorandum*, at 13, 15). The record, however, *proves* that Dr. Carter almost invariably treated Ms. Dixon on a monthly basis. (R. 361-74, 469-74, 532-38). Although Dr. Massette claimed he saw Ms. Dixon on a weekly basis, her reports and those of Ms. Saunders are quarterly, and there is no longitudinal record of treatment.

The plaintiff also claims that Dr. Carter reported she was doing "fine" even though she was *pulling out her hair and eyebrows*. (*Plaintiff's Memorandum*, at 15). Even a cursory review of the record requires rejection of this claim. The progress note by Dr. Carter referred to in the plaintiff's brief states at the top that either Ms. Dixon's mother or Ms. Dixon, herself – the note does not reveal which – reported that she was experiencing "hair loss" followed by the doctor's symbol for not (an

O with a forward slash running through it), followed by the words "related to Concerta." Concerta is one of the drugs Ms. Dixon was taking. (R. 371). Apart from the fact that hair loss is a possible side effect of that medication, http://www.netdoctor.co.uk/ adhd/medicines/concerta-xl.html, nowhere does the note say that Ms. Dixon was pulling her hair out.

Common sense and human experience – which always have a role to play in judging, *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010); *see also Miller v. Alabama*, 132 S.Ct. 2455, 2464 (2012); *Ryburn v. Huff*, 132 S.Ct. 987, 991 (2012); *United States v. Nixon*, 418 U.S. 683, 705 (1974); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir.1992) (Breyer, C.J.); *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989); *see generally,* Richard Posner, How Judges Think (2008) – dictate that a psychiatrist would not make a progress note that euphemistically described as "hair loss" the loss of hair resulting from the patient's volitional act of pulling out her own hair.

The rest of the note confirms that it was not reported to Dr. Carter that Ms. Dixon was engaging in what is a form of self-mutilation. Immediately below the reference to the phrase "patient has had hair loss," appears the entry that the plaintiff prefers an alternate drug, Zyprexa. She reported her sleep and appetite were good and Dr. Carter observed that she was groomed, cooperative, had good eye contact with spontaneous speech and okay mood. Her affect was appropriate and reactive and her insight and judgment were characterized as good, which is the highest rating on the preprinted form.(R. 371). Dr. Carter's assessment was that she was stabilized on her medicines. He did note insomnia and "partial hair loss." He clearly, however, did not attribute this to some volitional act on the part of Ms. Dixon. He made a note to monitor hair loss. (R. 371). That hair loss subsided over the next couple of months. (R. 369-70).

Psychiatry and psychology are inexact sciences, and mental health professionals "disagree

widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, [and] on cure and treatment, . . . ."  *Ake v. Oklahoma,* 470 U.S. 68, 81 (1985); *cf., Brown v. Watters*, 599 F.3d 602, 611 (7th Cir. 2010)("the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science...."); *Brown v. Watters,* 599 F.3d 602, 611 (7th Cir.2010); *Brown v. Sternes*, 304 F.3d 677, 696 (7th Cir. 2002).

Here Dr. Carter disagreed with Dr. Massette and Ms. Saunders.  The flaws Ms. Dixon perceives in Dr. Carter's assessment, and the ALJ's acceptance of it, were nearly all manufactured from mischaracterization and misreadings of the record.  Overall, the reasons the ALJ gave for discounting the opinions of Dr. Massette and Ms. Saunders were valid.  His treatment of the medical opinions may not have been flawless, but ut doesn't have to be.  *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).  He was within his rights to favor the assessments of Ms. Dixon's treating psychiatrist, Dr. Carter.

## 2.

Ms. Dixon next argues that the ALJ failed to properly incorporate his finding that Ms. Dixon suffered moderate limitations in concentration, persistence, or pace into his residual functional capacity ("RFC") determination or his hypothetical to the vocational expert.  Ms. Dixon asserts that the ALJ found, at step two and in his RFC analysis, that she suffered moderate limitations in concentration, persistence, or pace, and that he more specifically sated that she was moderately limited in her abilities to:

> (1) understand, remember, and carry out detailed instructions; (2) set realistic goals or make plans independently of others; (3) to get along with coworkers and peers without distracting them; and (4) *complete a normal workday and workweek at a*

> *consistent pace*. (AR. 20, emphasis added.) The opinion that the ALJ relied upon also
> indicated Ms. Dixon was moderately limited in her ability to "*maintain attention and
> concentration for extended periods*".

(*Plaintiff's Memorandum*, at 19 (emphasis in original)).  As the plaintiff concedes, the ALJ was

detailing the report of the state agency reviewing doctor, Dr. Travis.    From there, Ms. Dixon

contends that the ALJ failed to account for these specific limitations in maintaining pace and

concentration in his RFC or his hypothetical to the VE.  Citing cases like *Kassarsky v. Barnhart*, 335

F.3d 539, 543-44 (7th Cir. 2003) and *O'Connor-Spinner v. Astrue*, 647 F.3d 614, 619 (7th Cir. 2010),

she argues that the ALJ's failure requires a remand.

What Ms. Dixon's brief misses is that the ALJ accounted for these limitations by limiting

her to simple work requiring only one- or two-step tasks.  (R. 15).  The Seventh Circuit approved

of essentially the same incorporation of limitations into RFC and hypotheticals in  *Parrott v. Astrue*,

493 Fed.Appx. 801, 805 (7th Cr. 2012).  Ms. Dixon does not fault the ALJ for following the findings

of Dr. Travis, but she ignores that fact that it was Dr. Travis who distilled these limitations into a

restriction to work involving no more that one- or two-step tasks.  (R. 465).  He is the medical expert

with the experience to be able to do so.  The ALJ was clear about drawing this from Dr. Travis and

relying on his opinion (R. 15, 20-21), thereby providing the required "logical bridge" from the

evidence to his conclusion.  *Murphy v. Astrue*, 454 Fed.Appx. 514, 519 (7th Cir. 2012); *Ketelboeter

v. Astrue,* 550 F.3d 620, 625 (7th Cir. 2008).  Accordingly, his RFC and his hypothetical were both

based on substantial evidence.

Ms. Dixon also feels the ALJ was bound to include other limitations in his RFC and

hypothetical that were suggested by her attorney at the hearing  – limitations like being off task 20%

of the time or missing four days of work every month.  (*Plaintiff's Reply*, at 7; R. 84-95).  Plaintiff

does not suggest where such limitations come from. If they come from her own allegations, recall that the ALJ found her not credible, *and she does not challenge this finding*. If she is drawing them from Ms. Massette's opinion, the ALJ properly rejected them in favor of Dr. Carter's assessment. As such, the ALJ was not required to include these limitations in his RFC or hypothetical. *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009); *Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir.2007).

**3.**

Finally, Ms. Dixon complains that the ALJ's conclusion was not supported by substantial evidence because the vocational expert's testimony was patently inconsistent with the Dictionary of Occupational Titles ("DOT"). She claims that the jobs the VE identified all require a reasoning level of 2, whereas a one- or two-step job must require a reasoning level of 1.[4] Given the examples of jobs the VE cited – and they were only examples, one or two jobs out of dozens or more – it's not clear how the ALJ could know the VE's testimony was patently inconsistent with the DOT." Certainly, jobs like "assembler small products" or "checker boots and shoes" seem simple enough. In any event, as he was required, the ALJ asked whether the VE's testimony was consistent with the DOT. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). The VE assured him it was. (R. 82).

It is up to Ms. Dixon to show that the conflicts were so obvious that the ALJ should have picked up on them without any assistance. *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008).

---

[4] The DOT defines reasoning level 2 as being able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." Reasoning level 1 requires the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." http://www.occupationalinfo.org/appendxc_1.html.

And, again, any conflict is simply not apparent here. After all, why would it set off alarm bells if attaching one part to another or checking a boot be described as simple, one- or two-step jobs? There are, in fact, any number of assembly, packing, or checking/inspecting jobs in the level 1 reasoning category. http://www.google.com/cse?cx=partner-pub-7437757543052749%3A0942289255&ie=ISO-8859-1&q=reasoning+level#gsc.tab=0&gsc.q=G ED%20R1%20assembler; http://www.google.com/cse?cx=partner-pub-7437757543052749%3A0942289255&ie=ISO-8859-1&q=reasoning+level#gsc.tab=0&gsc .q=GED%20R1%20packer; http://www.google.com/cse?cx=partner-pub-7437757543052749%3A0942289255&ie=ISO-8859-1&q=reasoning+level#gsc.tab=0&gsc.q= GED%20R1%20checker; http://www.google.com/cse?cx=partner-pub-7437757543052749%3A0942289255&ie=ISO-8859-1&q=reasoning+level#gsc.tab=0&gsc. q=GED%20R1%20inspector.

Moreover, the VE, herself, resolved any conflict in response to Ms. Dixon's counsel's questions about what constituted a one- or two-step job:

> If we're looking at short term really one or two [steps] really the most basic of assembly jobs. I think most of these with the numbers I gave, you could probably reduce them by 30 percent, but like I said the most assembly jobs; the most basic packing jobs so now that you brought this to my attention, I think I will reduce all these jobs by 30 percent because we're talking the most simple of assembly jobs; the most simple of the packing jobs and I'm thinking no more than one or two steps in actually doing the assembly that would include picking it up or putting it down.

(R. 83). Even reducing the numbers the VE originally cited by 30% or even more, there would still be a significant number of jobs in the regional economy that Ms. Dixon could perform. Unlike the VE in *Overman*, the VE here did not contradict herself. She merely pared down the number of

potential positions upon reflection over the number of steps they'd likely require.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [#17] is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

DATE: 1/28/14